**WILLIAMS & WADDELL, Inc.,**
Plaintiff,

v.

**R. C. PITTS, Director of Internal Revenue for the District of South Carolina, Defendant.**

Civ. A. 4423.

United States District Court
E. D. South Carolina,
Columbia Division.

Feb. 26, 1957.

C. W. Knowlton (Boyd, Bruton & Lumpkin), Columbia, S. C., for plaintiff.

N. Welch Morrisette, U. S. Atty., Irvine F. Belser, Jr., Asst. U. S. Atty., Columbia, S. C., Charles K. Rice, Asst. Atty. Gen., James P. Garland, Robert H. Showen, Attorneys, Dept. of Justice, Washington, D. C., for defendant.

WYCHE, District Judge.

Plaintiff brings this action to recover income taxes alleged to have been erroneously assessed against it for its taxable year ending June 30, 1951. The alleged erroneous assessment was paid and plaintiff's claim for refund rejected. The case involves the deductibility as "ordinary and necessary business expenses" of certain payments made by plaintiff pursuant to a written agreement with the widow of a deceased stockholder and officer of plaintiff company.

### Findings of Fact

Plaintiff, a South Carolina corporation originally named Salley & Williams, Inc., is and was an insurance general agent engaged in servicing fire insurance and other allied lines with its principal place of business in Columbia, South Carolina. The original principals in the corporation were Reed Salley and Latimer Williams, Jr., who were officers, each owning 50% of the outstanding capital stock. In March, 1950, Reed Salley died devising his stock in plaintiff to his widow Mrs. Rosalie F. Salley.

As a general agency plaintiff is similar to a wholesaler in other types of businesses. Its authority to act for insurance companies stems from its general agency agreements with the companies. These agreements by their terms are terminable at the will of either party by giving the required notice, varying from thirty to ninety days. In practice, plaintiff fulfills, in its territory, the role of the home office of the insurance companies it represents, servicing policies, selecting and supervising the local agencies and approving claims.

Mr. Salley's death created a vacancy in plaintiff's organization. If was necessary to bring in a new man acceptable to the insurance companies plaintiff represented. Otherwise plaintiff's terminable agency agreements could be cancelled and its business ruined. Mr. William F. Prioleau, an insurance man of many years experience, was at that time state agent for Aetna, one of the companies for whom plaintiff acted as general agent. Mr. Prioleau acted for Aetna in negotiating with plaintiff concerning the replacement problem, approving or disapproving various proposed solutions. Mr. Prioleau also acted for two other important companies represented by plaintiff, Allemannia Fire Insurance Company and Albany Insurance Company, in the matter at the request of those companies.

Mrs. Salley proposed her son and later one other person as replacements. However, the parties concerned were advised by Mr. Prioleau that these proposed replacements were not acceptable to the insurance companies for which he was acting. Mr. C. D. Waddell, Jr., proposed by Mr. Williams, was acceptable to the companies but Mrs. Salley would not approve him nor sell her stock to him. Plaintiff was then advised informally by Mr. Prioleau that the agency agreements with Aetna, Allemannia Fire Insurance Company and Albany Insurance Company would be cancelled unless the problem was resolved soon. This was followed by official notices of cancellation by some of the companies, including Aetna.

Finally, on September 7, 1950, an agreement among the parties was consummated. Mrs. Salley transferred her stock to Mr. Waddell, taking his note for the purchase price of $15,000 payable in monthly installments of $99. As a prerequisite to selling Mrs. Salley insisted on an agreement by plaintiff to pay her $100 per month for life with such payments to be increased if plaintiff's net earnings increased to certain specified brackets. Such an agreement was executed on behalf of plaintiff, reciting that it was in consideration of the benefits accruing to the agency (plaintiff) by virtue of the sale of stock

by Rosalie F. Salley to C. D. Waddell, Jr. The agreement also stipulated that the stock so transferred would not be voted to dissolve plaintiff or increase the authorized capital in excess of 250 shares without Mrs. Salley's consent. The agreement bears the same date, September 7, 1950, as Mr. Waddell's note. After the sale the notices of cancellation were withdrawn by the insurance companies.

Since October, 1950, plaintiff has made the stipulated payments of $100 per month to Mrs. Salley and it is the deductibility of these payments which is the legal issue in this case.

Plaintiff introduced evidence bearing on the value of the stock sold by Mrs. Salley to Mr. Waddell. A balance sheet prepared by an independent firm of accountants at the close of the plaintiff's fiscal year ended June 30, 1950, showed plaintiff to have a net worth of $20,256.13. Included in this net worth is an item for "good will" of $11,225.00. However, even including this item, the book value of Mrs. Salley's stock was $10,128.07. Plaintiff's witness, Prioleau, an experienced insurance man, testified that in his opinion, based upon the financial statements, his knowledge of the industry and his knowledge of plaintiff's affairs acquired during negotiations, that the true market value of the stock was less than its book value and worth far less than the $15,000 purchase price agreed to by Mr. Waddell. In 1955, Mr. Latimer Williams, Jr., died leaving his 50% interest in the corporation to his widow, Mrs. Carolyn Williams. As of June 30, 1955, plaintiff's financial statement showed a net worth of $17,393.65, including the same "good will" figure that was shown in 1950. Mrs. Williams sold her half interest to Mr. Waddell for $6,000 and still another replacement, Mr. Joseph Lumpkin, has been brought into the business. The later statement shows and Mr. Prioleau testified that there were no factors in 1955, making the market value of the stock radically different from what it was in 1950. Defendant offered no evidence to contradict this valuation or to show that the stock was worth more than Mr. Waddell's purchase price of $15,000. I find that this purchase price was at least equal to and probably more than the fair market value of the stock.

The negotiations with Mrs. Salley in 1950, were strained and rather unpleasant. There is no evidence that the corporation's agreement with her was executed with any feeling of generosity or intention to make her a gift. Bearing in mind that Mr. Waddell was a new principal in the business and younger than Mr. Williams, I find no intent on the part of the corporation to pay him a disguised dividend by means of these payments.

I further find that plaintiff did not and is not purchasing a capital asset with these payments to Mrs. Salley.

### Conclusions of Law.

Section 23(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(a), (now section 162 in the 1954 Act, 26 U.S.C.A. § 162) allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." Although this section has been in the Code for many years there has been evolved no precise or scientific definition of the words "ordinary and necessary expenses". However, a statement by the Board of Tax Appeals has been often quoted: "It is well settled that expenditures made to protect or to promote a taxpayer's business, and which do not result in the acquisition of a capital asset, are deductible." Edward J. Miller, 37 B.T.A. 830.

In the case of Aitkin v. Commissioner, 12 B.T.A. 692, two members of a partnership bought the partnership interest of a third partner whose conduct was jeopardizing the firm. The withdrawing partner was paid in full for the value of his interest in the firm plus an additional amount of $5,000 which was demanded before he would consent to the sale of his interest. The $5,000 was allowed as a deduction as a business expense. This case was fol-

lowed in Mosser, 27 B.T.A. 513. The fact that a payment may be highly unusual does not prevent its being an ordinary and necessary business expense. In Trelfall, 3 T.C.M. 461, deductions were allowed for payments by surviving partners to the widow of a deceased partner for her life, or until her remarriage, for fear that her influence, if she were dissatisfied, could cause the cancellation of valuable contracts by an important customer of the firm. The Court summarized its reasoning as follows: "The respondent's contention that the payments were made for the purchase of P. A. Martin's interest and were therefore capital expenditures has nothing to support it. The payments were not made for the purchase of goodwill but for the purpose of continuing in existence the contracts between the railroads comprising the New York Central system and The D. & M. Cleaning Process, Inc. The petitioners feared that if Martin's widow did not receive a share in the profits she would become dissatisfied and that the New York Central system contracts would be cancelled. Clearly, a payment which is made under these circumstances cannot be regarded as an amount paid for the acquisition of a capital asset."

Defendant relies on the case of Newark Milk & Cream Co. v. Commissioner of Internal Revenue, 34 F.2d 854, 859, which involved payments by a corporation to former stockholders who sold out to other stockholders in the concern. It should be noted, however, that the Third Circuit merely decided not to upset the findings of fact by the Tax Board, to wit, that the payments by the corporation "were parts of the price paid by the present stockholders to buy out their fellow stockholders and get control of the company." A distinction between the apparently conflicting cases allowing such deductions and those disallowing them is that settling a dispute among stockholders, acquiring a change of management or change of control is not enough to justify a deduction. The taxpayer itself must receive an independent benefit distinct from the benefits the stockholders involved may derive. In the case at bar, like the Trelfall case, supra, the taxpayer was in danger of losing contracts indispensable to its very existence. Without its general agency agreements the taxpayer could not exist. There was nothing indirect or nebulous about the importance of these agreements to the taxpayer. The sale of stock in this case was made to an outsider, and in fact the old stockholder, Mr. Williams, was not a party to the transaction with Mrs. Salley. This case does not raise the suspicion present in the Newark Milk & Cream Co. case, supra, that the corporation in effect assisted one of its older principals or stockholders to purchase the stock of another.

The taxing authorities often take the position that payments such as these were disguised dividends to the purchasing stockholder. This position would be unrealistic here because Mr. Waddell was new to the organization. The case of Tucker v. Commissioner of Internal Revenue, 8 Cir., 226 F.2d 177, was decided while the case at bar was pending. There similar payments were made by the corporation to induce a stockholder to sell to prevent the loss of its franchise to sell Ford automobiles. The Commissioner attempted to tax the payments to the purchasing stockholder as a constructive dividend. The Eighth Circuit reversed the Tax Court, holding that such payments were not dividends.

The purchase price here was at least equal to the true value of the stock, and in my opinion, the payments by the corporation under its agreement with Mrs. Salley were not a part of the sale transaction but to prevent the very real danger of cancellation of agency contracts indispensable to its existence.

It is, therefore, my opinion that the plaintiff is entitled to judgment against the defendant for the amount of income taxes paid under protest with interest, and

It is so ordered.